James P. Bonner (JB-0629)
Shalov Stone & Bonner LLP
485 Seventh Avenue
Suite 1000
New York, New York 10018
(212) 239-4340

CV. 06 1623

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

APR 07 2006

BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

STEWART WEISS AND SUSAN WEISS,
INDIVIDUALLY AND ON BEHALF OF THEIR
MINOR CHILDREN YEDIDYA WEISS AND AYELET
WEISS; PNINA WEISS; TALIA WEISS; ELI WEISS;
DAVID LAHAV AND YEHUDIT LAHAV,
INDIVIDUALLY AND ON BEHALF OF THEIR
MINOR CHILD, NETTA LAHAV; YAEL LAHAV;
LIRON LAHAV; MARK ROBINSON AND REENA
ROBINSON, INDIVIDUALLY AND ON BEHALF OF
THEIR MINOR CHILD, YARDENA ROBINSON;
DAGAN ROBINSON; ITAI ROBINSON; DANIEL
ROBINSON; ARYE WEISS; SHIMON LEV; NOA LEV;
AYNAT SCHUR; NADAV LEV; AMICHAI LEV;
YAEL GAT; AND GITIT LEV,

CIVIL ACTION

CASE NO. _____

**COMPLAINT**

POHORELSKY, M.J.

PLAINTIFFS,

-against-

ARAB BANK, PLC,

DEFENDANT.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

The following Plaintiffs, by their attorneys, allege the facts set forth herein based upon

their information and belief: Stewart Weiss and Susan Weiss, individually and on behalf of their

minor children, Yedidya Weiss, a minor, and Ayelet Weiss, a minor, Pnina Weiss, Talia Weiss,

and Eli Weiss (collectively, "the Family of Ari Weiss"); David Lahav and Yehudit Lahav,

individually and on behalf of their minor child, Netta Lahav, Yael Lahav, and Liron Lahav (collectively, "the Family of Shaul Lahav"); Mark Robinson and Reena Robinson, individually and on behalf of their minor child, Yardena Robinson, Dagan Robinson, Itai Robinson and Daniel Robinson (collectively, "the Family of Matanya Robinson"); Arye Weiss (father of Shmuel Weiss, deceased); and Shimon and Noa Lev, Aynat Schur, Nadav Lev, Amicai Lev, Yael Gat, and Gitit Lev (collectively, "the Family of Hagai Lev").

## NATURE OF THE ACTION

1.     This case concerns the murder of five young United States citizens who were also citizens of the State of Israel: Ari Weiss, Shaul Lahav, Matanya Robinson, Shmuel Weiss and Hagai Lev (the "Terror Victims").   The Terror Victims were killed by acts of international terrorism, as defined by 18 U.S.C. § 2331, while serving in the Israel Defense Forces ("IDF"). The injuries and losses suffered by Plaintiffs did not occur by reason of "an act of war" as defined in 18 U.S.C. § 2331(4).   Accordingly, Plaintiffs may assert the broad cause of action provided by 18 U.S.C. § 2333 to "any national of the United States injured in his or her person … by reason of an act of international terrorism" or to the "survivors or heirs" of any such person, and that claim is not impacted by the limitation set forth in 18 U.S.C. § 2336(a).

2.     The murders of the five young Terror Victims were acts of international terrorism because they were killed by violent acts that would be criminal violations if committed within the jurisdiction of the United States or any State of the United States.   Those acts of terrorism were intended to influence the policies of the government of Israel and/or the policies of the United States government through intimidation or coercion or to affect the governments of the United States or Israel by assassination.   The murders were also intended to intimidate or coerce a civilian population.

3.      During the Second Intifada, several prominent terrorist organizations operated from Palestinian-controlled territory to commit terror attacks against the Jewish population in Israel, including premeditated assassinations of soldiers serving in the IDF.  Most notably, those terrorist organizations included the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad (the "PIJ"), and the Al Aqsa Martyrs Brigade ("AAMB").   These groups, individually or in combination, were responsible for the murders of Ari Weiss, Shaul Lahav, Matanya Robinson, Shmuel Weiss and Hagai Lev.  These murders by these terror groups did not occur in the course of a declared war or in the course of armed conflict between nations.  Nor did they occur in the course of armed conflict between military forces.  Rather, they occurred as part of and in the course of a wave of terror attacks, as described herein.

4.      From at least the Fall of 2000 until at least late 2004, Arab Bank knowingly and willfully conspired with and aided and abetted HAMAS, the PIJ and AAMB.  Arab Bank also knowingly provided material support and substantial assistance to those responsible for the terror attacks that killed the five young Terror Victims.  By that conduct, Arab Bank violated 18 U.S.C. §§ 2339A, 2339B and 2339C.  Arab Bank is therefore liable to Plaintiffs for the damages the Plaintiffs have suffered by reason of the terrorist actions described in detail in this Complaint.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333 and 2334 because this is a civil action brought by nationals of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism.  This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

7.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 301 because, among other things, it continuously and systematically does business in the State of New York.  Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank: (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortious acts within the State of New York; (d) has committed tortious acts outside the State of New York causing injury within the State of New York; (e) derives substantial revenue from goods used or consumed in the State of New York; and (f) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce.  Arab Bank also is also subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

### A. The Plaintiffs

#### (1). The Family of Ari Weiss

8.      Ari Weiss ("Ari") was a citizen of the United States residing in Israel at the time he was assassinated by a Palestinian terrorist.  Ari was born in Dallas, Texas in 1980.  He lived there with his parents until 1992, when the family moved to live in Israel.

9.      On September 30, 2002, Ari was serving with the IDF in an engineering battalion in the town of Nablus in the "West Bank."  Nablus, at the time, was the location of the main Palestinian terrorism infrastructure and was the headquarters of the terrorist organizations'

leadership in the West Bank.  HAMAS, PIJ, AAMB and other terror groups had leaders and planners located in Nablus.  From Nablus' terrorism operational centers, terror squads in the Jenin, Tulkarm, Qalqilya and Ramallah areas were directed.  Joint terror operations often were planned and conducted from Nablus, especially from the old part of the town, the Casbah, and from nearby Palestinian refugee camps.  HAMAS maintained explosives laboratories in Nablus. Numerous Qassam rockets and arms caches were stored in Nablus, particularly in the Casbah.

10.    At approximately 6 P.M. on September 30, 2002, Palestinian terrorists opened fire near the Nablus Casbah, hitting Ari and another member of his engineering battalion.  This was a premeditated homicide intended to kill.  Ari suffered a bullet wound in his shoulder, and the bullet entered his lung.  Ari died in the terror attack as a result of these wounds.

11.    The PIJ claimed responsibility for the terror attack that took Ari's life.  This terror attack was within the scope of the scheme and conspiracy alleged below in which Arab Bank participated.

12.    Stewart and Susan Weiss, both United States citizens who were born and raised in the United States, are Ari's parents.  They now reside in Israel.  Pnina, Talia, Elie, Yedidiya and Ayelet are the brothers and sisters of Ari who survived his death.  Yedidiya and Ayelet are minors and bring this action through their parents, Stewart and Susan, as their next friends.  The Family of Ari Weiss has suffered tremendous pain and mental anguish as a result of the murder of Ari by reason of international terrorism.

### (2).  The Family of Shaul Lahav

13.    Shaul Lahav was a citizen of the United States and Israel who was living in Israel at that time he was murdered by a Palestinian terrorist attack.

14.    On November 18, 2003, Shaul Lahav, then 20 years old, was serving with the IDF at a checkpoint on a tunnel bypass road near Bethlehem.  This road links Jerusalem and Efrat, two major cities with large Jewish populations.

15.    At that time, numerous terrorists were attempting to enter Jerusalem from the "West Bank" to commit suicide bombings and other terror attacks as part of the Second Intifada. Soldiers had been placed in areas along the roads to try to establish safety for the civilian population under attack from these terror groups.

16.    Shortly before 6 A.M. on November 18, 2003, Shaul Lahav was assassinated by a Palestinian terrorist who opened fire with an automatic rifle at the checkpoint.  The terrorist approached the checkpoint with an AK-47 hidden in a prayer rug.  This was a premeditated homicide intended to kill.

17.    The AAMB claimed responsibility for this terror attack, which was within the scope of the scheme and conspiracy alleged below in which Arab Bank participated.

18.    David and Yehudit Lahav, both United States citizens who now reside in Israel, are Shaul Lahav's parents.  Netta, Liron and Yael are the brothers and sister of Shaul Lahav. Netta, Shaul's sister, is a minor who brings this action through her parents, David and Yehudit, as her next friends.  The family of Shaul Lahav has suffered tremendous pain and mental anguish as a result of the murder of Shaul by reason of international terrorism.

### (3).  The Family of Matanya Robinson

19.    Matanya Robinson was a dual citizen of the United States and Israel who was living in Israel at that time he was murdered by a Palestinian terrorist attack.

20.    On April 8, 2002, Matanya Robinson, then 21 years old,  was serving in the IDF in the Jenin area of the West Bank.   Jenin was then known as the "Capital of the Palestinian

Suicide Terrorists" because of the large number of suicide bombers who originated from the area. Various terrorist organizations engaged in substantial activity in Jenin at that time, including PIJ, HAMAS, AAMB and Tanzim. Many of the members of those terrorist organizations were concentrated in the refugee camp located in Jenin. During this time, PIJ gun squads operated in homes in the refugee camp and frequently ambushed and assassinated Jewish soldiers.

21.     While Matanya Robinson was in the Jenin refugee camp, he was assassinated when terrorists open fire on him. Shmuel Weiss, a medic trying to come to Matanya's aid, was also shot and killed. The perpetrators were Palestinian terrorists. This was a premeditated homicide intended to kill. This terror attack was within the scope of the scheme and conspiracy alleged below in which Arab Bank participated.

22.     Reena and Mark Robinson are both United States citizens and are the parents of Matanya, Dagan, Itai, Daniel, and Yardena Robinson. Yardena, age 14, is the sister of Matanya and brings this lawsuit for her loss through her parents, Reena and Mark Robinson, her next friends. The family of Matanya Robinson are his heirs and survivors. The family resides in Israel.

23.     The family of Matanya Robinson has suffered tremendous pain and mental anguish as a result of the murder of Matanya by reason of international terrorism.

### (4). Shmuel Weiss and His Family

24.     Shmuel Weiss is the son of Arye Weiss, a United States citizen. Arye is the heir and survivor of Shmuel and resides in Israel.

25.     On April 8, 2002, Shmuel Weiss, age 19, was serving in the IDF in the Jenin refugee camp.   As described above, he was murdered, along with Matanya Robinson, by Palestinian terrorists.

26.     This terror attack was within the scope of the scheme and conspiracy alleged below in which Arab Bank participated.   Arye Weiss and the family of Shmuel Weiss have suffered tremendous pain and mental anguish as a result of the murder of Shmuel by reason of international terrorism.

### (5). The Family of Hagai Lev

27.     Hagai Lev was a citizen of the United States because his mother is a United States Citizen.   Noa and Shimon Lev are the parents of Hagai Lev.   Noa is a United States citizen and Shimon is not.   Noa and Shimon have five other children, all of whom are also United States citizens: Aynat Schur, Nadav Lev, Amicai Lev, Yael Gat and Gitit Lev.   These plaintiffs are the surviving brothers and sisters of Hagai Lev.

28.     Hagai Lev was assassinated by Palestinian terrorists on July 10, 2002, while he was serving in the IDF in the Rafah area in the southern part of the Gaza strip.   Hagai Lev was 24 years old at the time he was murdered.   At that time, terrorists had dug many tunnels near Rafah to assist them in smuggling arms and explosives into the area to use in the terror attacks of the Second Intifada.   Many Qassam rockets were also manufactured in and around Rafah for use by terror groups in the Gaza Strip in connection with attack upon Jews living in and around the Gaza Strip.

29.     Around 7 A.M. on July 10, 2002, Hagai was patrolling the Rafah area when a sniper opened fire on him from one of the houses nearby.   The bullet struck Hagai in the face,

and he died shortly thereafter.  At the time of his death, Hagai had been married to his wife, Nurit, for 14 months.

30.     This was a premeditated homicide intended to kill.  This terror attack was within the scope of the scheme and conspiracy alleged below in which Arab Bank participated.  The family of Hagai Lev has suffered tremendous pain and mental anguish as a result of the murder of Hagai by reason of international terrorism.

### (6).     The Murders of the Terror Victims Were Acts of International Terrorism—Not Acts of War

31.     An act of war is expressly defined in 18 U.S.C. § 2336(a) as an act that occurs in the course of:

    A.  A declared war;

    B.  Armed conflict, whether or not war has been declared, between two or more nations; or

    C.  Armed conflict between military forces of any origin.

32.     The deaths of Ari Weiss, Shaul Lahav, Matanya Robinson, Shmuel Weiss and Hagai Lev did not occur by reason of acts of war.  Rather, they occurred by reason of international terrorism.  The murderers and of the Terror Victims and the terror organizations with which those murderers are affiliated are neither nations nor "military forces."  The legislative history of 18 U.S.C. § 2336(a) explicitly shows that Congress intended to bar actions that resulted from **"military action by recognized governments as opposed to terrorists."** HAMAS, PIJ, AAMB and the other terror groups responsible for these murders are neither sovereign entities nor *de facto* governments.

## B.      The Defendant

33.      Arab Bank, PLC is a Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution. Arab Bank owns, controls, and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Comptroller of the Currency of the United States Treasury Department.  Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York.  The Bank does business in the United States and approximately 30 other countries on five continents and has over 7,000 employees.  Arab Bank has an affiliate with over 100 branches in Saudi Arabia, Arab National Bank ("ANB"), and is a 40% shareholder of ANB.

## FACTUAL ALLEGATIONS

34.      Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS, the PIJ and AAMB.   Other terrorist groups also conducted terror attacks during the Second Intifada.  Several terror attacks were committed as "joint operations" that involved terrorists from more than one of these groups.

35.      PIJ and HAMAS are both primarily radical Islamist terrorist organizations that are committed to the globalization of Islam through violent "Jihad" or holy war.

36.      These groups are formally committed to the destruction of the State of Israel, are extremely anti-American and are committed to achieving their objectives by violent means,

including acts of international terrorism.  HAMAS is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

37.    The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad. HAMAS propaganda since the September 11th World Trade Center attacks has praised and glorified Osama bin Laden and his supporters engaged in global jihad.  HAMAS, directly and through its network of "charitable" front organizations, has engaged in a campaign of hate and virulent anti-Semitism designed to indoctrinate the Palestinian population, including young kindergarten children, to hate Jews and to incite violence against them.

38.    HAMAS is the largest of these terror groups and is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade. Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and to achieve the illegal objectives of the terrorist group as a whole.

39.    HAMAS' social services are, in large part, administered by local "zakat" committees and other "charitable organizations" ("Zakat" means charity in Arabic).  These committees and organizations are controlled by HAMAS members, operatives and activists sitting as members of their governing committees, a fact well known to Arab Bank.

40.    Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of money collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists' acts.  HAMAS uses such funds for,

among other things, the provision of weapons, explosives, transportation services, safehouses, and salaries for its terrorist operatives and for terrorist recruiters.

41.     HAMAS commits numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism, as defined by 18 U.S.C. § 1331, in violation of the federal criminal code of the United States.

42.     On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA").   HAMAS is also designated as a Specially Designated Global Terrorist Organization.

43.     The formal designation has been renewed every two years since 1997, including a renewal in August 2003.

44.     Like HAMAS, the PIJ is a radical Islamic terror group.   The PIJ knowingly, willfully, and unlawfully commits numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, and solicitation to commit murder, in violation of the federal criminal code of the United States.

45.     For example, the PIJ has committed numerous terrorist attacks, including several that have killed and injured American citizens.   Since September 2000, the PIJ has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder bombings that have killed over 90 civilians, including U.S. nationals.

46.    On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the AEDPA.  The designation has since been renewed every two years, including in 2003.

47.    AAMB is a paramilitary offshoot of the governing Fatah movement which emerged at the outset of the Second Intifada.  Force 17 and Tanzim are also paramilitary offshoots of Fatah that have committed acts of terrorism since at least early 2001.

48.    AAMB's, Tanzim's and Force 17's political lineage is secular and not Islamist in orientation, but they have adopted both the religious rhetoric and murderous acts of their radical Islamist counterparts.

49.    AAMB, Tanzim and Force 17 knowingly, willfully, and unlawfully commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, and solicitation to commit murder, in violation of the federal criminal code of the United States.

50.    For example, these organizations have committed numerous terrorist attacks, including several that have killed and injured American citizens.  Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately one hundred others, and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred (500) others, including U.S. citizens.

51.    On March 21, 2002, the Secretary of State of the United States officially designated AAMB as a Foreign Terrorist Organization pursuant to Section 219 of the INA and the AEDPA.

## The Al Aqsa Intifada or Intifada Al Quds

52.     Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations planned and launched a broad-based terror campaign against the State of Israel at the end of September 2000.

53.     This explosion of violence was widely termed the so-called Al Aqsa Intifada or Intifada Al Quds or, in western parlance, the Second Intifada (to distinguish it from an earlier period of violence in the 1980s).

54.     This Second Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

55.     Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000, various Palestinian terrorists have attempted approximately 21,000 attacks, which have caused more than 6,000 casualties, including over 800 civilian deaths.   These indiscriminate acts of violence have likewise resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

56.     The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli and U.S. governments by compelling Israel to withdraw from territory it presently controls.

57.     The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

    A. The Second Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

    B. The unrestrained violence of the Second Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

C. The main rival terrorist groups, including but not limited to HAMAS, PIJ, Fatah (Tanzim/AAMB), PFLP and The Popular Resistance Committees, began cooperating and coordinating their activities,.

D. Saudi financial support for HAMAS coalesced into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

## Arab Bank's Conspiracy to Finance Palestinian Terrorism

58.     In the fall of 2000, Arab Bank knowingly joined into a conspiracy and scheme to aid and support the terrorism of the Second Intifada.  The terror organizations and those that conspired with and aided them knew that the wave of violent terror attacks would be launched and that the attacks would span a long period of time: months and even years.  The scheme therefore included a system to finance and encourage the violence for a sustained period of time. The terror attacks that killed and injured the Terror Victims were overt acts of that conspiracy and were within the scope of the scheme described herein.

59.     The radical beliefs of Arab Bank's founders contributed to the Bank's willing support of the unlawful scheme Plaintiffs allege.  In 1984, the Shoman family published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled *The Indomitable Arab* in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel.  He also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel.

60.     Prior to the establishment of Arab Bank, its founder, Abdulhameed Shoman, described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.  In his biography, he is quoted as saying that within a few years Zionism will have grown strong enough to control the entire economy.  "I believe that all

business dealings with the Jews — buying, selling or banking transactions — are damaging to our country's best interests."

61.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years. He stated:

> I liked the Americans.  I once bore their nationality, and gathered my fortune in their country.  But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them.  It was not the Jews, but the Americans, who fought us.

62.    Mr. Shoman's son, Abdul Majeed Shoman, the recently deceased chairman of the Arab Bank, was a vocal supporter of the Intifada who often made public remarks demonstrating his extremist anti-Israeli views.

63.    He is, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada, which was established during the first Intifada in 1987-1988.   The Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000, for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence.  From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the families of martyrs of the first Intifada.

64.    On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Intifada.

65.    Defendant Arab Bank pledged $2,000,000.00.  Mr. Shoman pledged $500,000.00, personally.

66.    The Shoman family's support of the terrorist Intifada continued in June of 2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada." The express purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their 'martyrdom'.

67.    Accordingly, the Bank's financial and ideological support for the terrorist Intifada is a matter of public record and its participation in diligently implementing the universal terrorist death and dismemberment insurance scheme is knowing and deliberate. By its acts, Defendant Arab Bank knowingly, willingly and substantially assists in the recruitment of terrorists.

**The Formation of the Saudi Committee for the Support of the Intifada**

68.    A meeting of the Arab League was held in Cairo, Egypt in October of 2000. At that meeting, it was agreed, with the knowledge and participation of Defendant Arab Bank and Bank Chairman Abdul Majeed Shoman, that a financing distribution network or mechanism needed to be put in place to fund and fuel Palestinian terrorism to achieve various political and nationalistic goals. It was believed that millions and millions of dollars would be necessary to support the wave of terrorism which was planned to last months or even years.

69.    On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia in furtherance of this plan.

110513v2

70.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

71.     The Saudi Committee decided to bestow financial support to the martyrs' families and to call upon the Jordanian government to make the donations tax-exempt.  Abdul Majeed Shoman, then the Chairman of Arab Bank, opened a meeting to support the Intifada by saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it.  There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman].   The Welfare Association received donations and it has funds.  I received phone calls and donations from benevolent people and the Arab Bank's board and the bank's employees decided to donate 5% from October's salaries [for the Intifada].  In spite of the fact that donations were collected and are available, nothing was transferred to anybody.  It is our duty to act and therefore I summoned this meeting to hear from you.

72.     Mr. Shoman objected to locating the committee's office in Arab Bank's Amman headquarters building but he left open the possibility of "loaning" an accountant to the committee.

73.     Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters, where it in fact opened on November 1, 2000.

74.     As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab Bank announced that it would make financial donations to Palestinians injured during the Intifada.  Its employees donated 5% of their monthly salary to the Palestinian cause.  All of this activity was conducted publicly in Jordan.

75.     The Saudi Committee constitutes a professional fundraising apparatus intended to subsidize and finance the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and other terrorist organizations and their related charitable front

organizations in the West Bank and Gaza. The Saudi Committee has made direct assistance payments to 3 classes of beneficiaries: (a) Martyrs; (b) Prisoners; and (c) the wounded.

76.    Those facts were known to Defendant Arab Bank, which knowingly and willfully joined with the Saudi Committee to fulfill this goal. The activities of the Saudi Committee were often publicized, even by the Saudi Embassy in Washington, DC. Arab Bank was intimately aware and involved with the activities of the Saudi Committee. The Saudi Minister of Finance and other high ranking member of the Saudi government have acted as spokespersons for the Committee. The Saudi Minister of Finance sits on the board of directors of Arab Bank. Arab Bank's affiliate, ANB, is one of the largest banks in Saudi Arabia and it played a substantial role in collecting funds for the Saudi Committee. Both Abdel Hamid Shoman and, until his death, Abdel Majeed Shoman, sat on the board of ANB.

77.    The ability of the Saudi Committee to bankroll HAMAS and other Palestinian terror organizations to fuel the violence of the Second Intifada depended on the knowing participation and substantial assistance of Arab Bank.

## Incentivizing Suicide Bombers with Cash Rewards

78.    Arab Bank and its co-conspirators have advanced the goals of the Second Intifada by providing a comprehensive "insurance death benefit" of 20,000 Saudi Riyals, or the equivalent of roughly USD $5,316.06, to the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists and their beneficiaries whenever a terrorist is killed. The lump sum initial payment is often followed with lesser monthly payments.

79.    Benefits (less than if a terrorist is killed) are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

80.    The Saudi Committee has provided millions of dollars in benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well as those activists held in Israeli custody. This type of support is critical to terror organizations' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure capable of solidifying their position within Palestinian society. According to a sworn declaration of the Chief Banking Officer of Arab Bank made on November 11, 2004, "beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000."

81.    The "insurance benefit" not only provides universal coverage for specific members of preferred terrorist organizations such as HAMAS, but is intended as universal coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

82.    Defendant Arab Bank knowingly and willfully administers this comprehensive terrorist insurance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage." This financial support is a key inducement to terror. It has encouraged, incited and made possible the terror attacks of the Second Intifada.

83.    Arab Bank actively and knowingly participates in a formalized process that requires the families of so-called martyrs to obtain an official certification of their deceased relatives' status as a bona fide martyr, replete with an individualized identification number.

84.    Arab Bank, in turn, is provided relatively detailed lists by the Saudi Committee and representatives of the leading terrorist groups through their "charitable" front organizations consisting of the names of the martyrs, certain of their personal information and details concerning the date and manner of death.

85.    Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS and other terror groups, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account for each beneficiary. Every Palestinian family eligible under this universal coverage plan is encouraged to collect the terrorism benefits through a local branch of Arab Bank in the West Bank or Gaza.

86.    A report from the website of the Saudi Committee for Relief of the Palestinians (originally known as the Saudi Committee in Support of the Intifada al Quds), describes the mechanism of the donations and the transfer of the money:

The Mechanism of delivering relief:

1.  Assessment study of the Aids-relief inside Palestine
2.  Choosing the Programs that help in achieving the Aims and goals of the Committee
3.  Exploring How to deliver Aids-relief to beneficiaries
4.  Choosing some recommended Palestinian personalities for Follow-up
5.  Setting a Coordination council in Gaza and West Bank
6.  Listing names of beneficiaries of Committee programs and completing and revising the information
7.  Studying names of beneficiaries and opening files for them for taking the needed procedures later
8.  Sending Name-lists of beneficiaries to his Highness, the General Supervisor for taking the needed procedures
9.  **Opening accounts for each beneficiary in the branches of Arab Bank in Palestine**
10. Transferring Money for each beneficiary and notifying them

(http://www.alquds-saudi.org/static/mechanism.htm):

87.     The conspiracy among Arab Bank, the Saudi Committee, HAMAS and other terror groups is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."

88.     Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that, if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.  This acts as a material inducement.

89.     Similarly, such persons are virtually assured of receiving substantial stipends if they are injured or arrested.

90.     In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

91.     Through the program administered by Arab Bank, the Saudi Committee paid death benefits to at least 200 fallen "martyrs" in the first year of its existence alone.  As of November 2001, the Saudi Committee had paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.  After only 18 months, the Saudi Committee had raised over $57,000,000.  In one widely publicized telethon, the Saudi Committee raised over $100,000,000 on a single day!

92.     Arab Bank serves as the near exclusive administrator for the Saudi Committee's universal insurance coverage plan for Palestinian terrorists and their families.

93.     Indeed, on its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of Arab Bank in Palestine. Although it has since been removed from the Internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

94.     Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."   The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

95.     The Saudi Committee's web site at one time disclosed thousands of payments it had made to martyrs.  A Congressional Research Service ("CRS")[1] report reveals that the Saudi Committee did not treat the identify of the beneficiaries of its funds as confidential or private, but rather published this information on its web site.  According to this Report to Congress, the Saudi Committee web site contained over 40,000 transaction records that "feature the names of individuals who received money" from the Saudi Committee.  This enabled the analysts to compare those names with those of known and confirmed "suicide bombers."   The Saudi Committee web site records reflect it paid money to over 60 known Palestinian militants from October 2000 to March 2002, including suicide bombers!   A "sample of five names of beneficiaries on the Committee website matched those of":

-Said Hassan Hussein Hotari, who blew himself up in Tel Aviv on June 1, 2001, killing dozens of teenagers at the Dolphinarium nightclub;

-Izzedin Shahil Ahmed Masri, who blew himself up in Jerusalem on August 9, 2001, killing 15 people at Sbarro Pizza;

-Maher Muhiaddin Kamel Habeishi, who blew himself up on a Haifa bus on December 2, 2001;

---

[1] CRS is a research arm of the U.S. Congress within the Library of Congress.  It works exclusively for members of Congress, their committees and staff.

-Wa'fa Ali Khalil Idris, who blew herself up in Jerusalem in January 2002; and

-Mohammed Ahmed Abdel-Rahman Daraghmeh, who blew himself up in a neighborhood of Jerusalem.

The Congressional Report cited lists featured on the Saudi Committee web site that showed the recipient of the funds had died in a *"amaliya istishadiya,"* i.e., a "martyrdom operation."

96.     In the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identified payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr. For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv, is listed as an illustrative martyr.

97.     Accordingly, there can be no confusion as to whether the "insurance plan" includes the families of suicide bombers and no question that defendant Arab Bank possesses knowledge of this fact.

98.     Defendant Arab Bank provides a convenient means for distributing this universal coverage death and dismemberment benefit across Palestinian-controlled territories. Distributing those funds would be far more difficult if attempted by other means, such as courier. Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

99.     Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign. Arab Bank knowingly allows the terrorist groups to use the speed and efficiencies of the international banking system, including the SWIFT system of wire

transfers, to further their terrorism agenda.  It also provided its facilities and staff to assist the financial services it provides terrorist groups.

100.  The Saudi Committee and local HAMAS and PIJ "charitable" front organizations have publicly and repeatedly advertised their unlawful purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which was known to Arab Bank.  All of those communications are calculated to – and do – reach terrorists and potential terrorists.  For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or who were held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee…"; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 …."

101.  Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank.  Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in at least two (2) important respects.

102.   Firstly, Arab Bank provides both professionalism and transparency to the process, thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.  The willingness of a major institution in the Middle East to perform services for the terrorists helps to legitimize terrorism and, in that way as well, further assists the terrorists.

103.   Secondly, Arab Bank, through its extensive network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists, who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

104.   By knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000, including those that have injured, harmed or killed Plaintiffs.

105.   Arab Bank was aware of the methods and means by which HAMAS and other Foreign Terrorist Organizations seek to carry out their objectives.  In fact, Arab Bank's own support of, and commitment to, the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's Chairman, Abdul Majeed Shoman.   According to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), Shoman traveled to Qatar to a meeting to raise money to finance and support the Second Intifada.

106.   In a July 2000 published report in the Jordanian daily newspaper *Addustour*, Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

107.   A published report in an October 2000 issue of the Jordanian daily newspaper *Addustour* stated that both the management and employees of Arab Bank were donating funds to support the Intifada.

108.   Neither the ideology nor the actual conduct of Arab Bank is passive or indifferent to the goals of, and means employed by, the terrorists; rather, Arab Bank is a knowing, willful and material participant in the terrorists' conduct.  This is consistent with the ideology of the Bank's founders, the Shoman Family, who have been long-time supporters and even executives of the PLO.

109.   The Arab Bank website section dealing with the Bank's Palestine branches reflects certain direct financial donations of Arab Bank for "Palestinian community projects." These payments reveal Arab Bank's clear role in supporting the violence against civilians.

Among the donations listed are:

- 17/8/2004 - Mandella Organization/ Donating School Bags to Prisoners' Children

- Arab Bank offered prisoners' children school bags as well as stationery, aiming to help and support them and their children with their suffering

- 2/5/2004 - Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University

- Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University. The donations were given through buying books about Palestinian Prisoners' lives, thus supporting the Prisoner's Movement in Palestine

- 21/3/2003 - Arab Bank sponsors the Event of Recognizing Mothers of Martyrs and Prisoners

- Arab Bank sponsored the event of recognizing the mothers of Martyrs and Prisoners in Al Amari refugee camp.  The event was organized by the Women Center in the refugee camp.

(http://www.arabbank.ps/english/inner.asp?item=3&mtitle=4&stitle=1)

110.   The Bank explicitly acknowledges its support of "mothers of Martyrs and Prisoners," showing its direct involvement in assisting families of terrorists.

## Defendant Arab Bank Provides Material Support to Foreign Terrorist Organizations

111.   In addition to providing the comprehensive universal insurance coverage described above, Arab Bank provided financial services to known terrorist groups and their alter egos, as described below.

112.   Both HAMAS and the PIJ raise funds to support their terrorist acts through "charitable" front organizations, which they control.   They also raise funds to finance an educational and social services network through which they can indoctrinate the population with a hatred for Israel, Jews, Americans and other non-radical Islamists, while glorifying acts of violence by "shaheeds," so that HAMAS and PIJ will have a Palestinian population ready and willing to engage in terrorism.

113.   Arab Bank knowingly provides banking services to these "charitable" committees and affirmatively assists them in distributing funds to support the Intifada terror and hate campaign.   Arab Bank does not merely provide routine banking services to these groups. Throughout the Second Intifada, Arab Bank has knowingly permitted various terrorist organizations and persons engaged in terrorism to solicit funds for their armed struggle over the radio, TV, and Internet, and helped that endeavor by providing bank accounts and financial services to further the collection and distribution of funds for that purpose.   It has permitted PIJ to solicit funds for jihad in Palestine by sending money to specific Arab Bank accounts, listing the branch and account numbers to which to send the money.

114.   Arab Bank knowingly provided banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut.   That account collected funds

directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS, which Arab Bank affirmatively assists in distributing funds to support the terror campaign. Arab Bank has also maintained accounts for individual terrorist operatives, including, but not limited to, a Hamas operative from Qalqiliya, and Fatah/Tanzim leaders from Jenin and Nablus. It also knowingly provides financial services for the families of suicide bombers.

115.    The United States Department of Justice has identified the website www.palestine-info.com as the "official" website of HAMAS. The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at Arab Bank in Beirut. The site also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

116.    This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and that HAMAS controls and maintains directly.

117.    To assist it in carrying out its terrorist activities, HAMAS has established or taken over numerous "charitable organizations," including:

      a.     Al-Ansar Charity;

      b.     Ramallah Charitable Committee or Society;

      c.     Tulkarem Charitable Committee;

      d.     the Islamic Association (Gaza), a/k/a Al Jamaya Al-Islamiya;

      e.     Al Mujama Al-Islami;

      f.     Nablus Charitable Committee;

      g.     Jenin Charitable Committee or Society;

      h.     Islamic Charitable Society of Hebron, a/k/a Al-Jamiyah Al-Khiriah Al-Islamiyah; and

i.      Bethlehem Orphan Care Society, a/k/a jami'yya ri'aya al-yatim

118.   Arab Bank provides financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee.

119.   The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by the United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

120.   The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS, a fact which either was known or but for its willful blindness would have been known to Defendant Arab Bank.

121.   The ties between Arab Bank, HAMAS and the Tulkarem Charitable Committee have been demonstrated.  For example, a document posted on the HAMAS internet web site on July 10, 2004 reveals that, in appealing to an Arab Bank director for support from the Saudi Committee, the chairman of the Tulkarem Charitable Committee stated:

> To save the holy Temple Mount and the intifada of the valiant Palestinian people...to reveal the Zionist danger to the Arab and Islamic world...to save Jerusalem and Al-Aqsa, to support the fighters and to publicize their courage and brave resistance...to expose the truth other are trying to hide, ignore and distort...the Palestinian Information Center [the HAMAS internet site], Palestine's voice to the world...[calls upon you to] contribute to the Palestinian Information Center site on the Internet, contribute to the site so that it can continue to expand...help us, participate in the truth by supporting Palestinian and Islamic media.  The Palestinian Information Center accepts contributions and financial participation. The account is in American dollars.

**HAMAS Alter Egos**

122.    Plaintiffs allege that the following entities are fronts, agents, instrumentalities or alter egos of Hamas:

      a.      Islamic Charity Association, a/k/a Islamic Charitable Society in Hebron;

      b.      Charity Committee in Ramallah, a/k/a Ramallah Zakat Committee;

      c.      Jenin Zakat Committee, a/k/a The Charity Association in Jenin;

      d.      Nablus Zakat Committee;

      e.      Toklarem (a/k/a Tularm) Zakat Committee;

      f.      Orphan Care Association (Bethlehem);

      g.      Qalqulia (a/k/a Qalqiliyah) Zakat committee;

      h.      Hebron Zakat Committee, a/k/a Hebron Tithing and Alms Committee;

      i.      Halhul Zakat Committee; and

      j.      Al Aslah Association in el Bireh.

123.    Plaintiffs will show that these entities are the alter ego of HAMAS and knowingly act as agents for HAMAS, all of which is well known to Arab Bank because, among other things:

      a.    leaders of the committees are HAMAS operatives;

      b.    the Committees are connected to HAMAS military operations;

      c.    The Palestinian Authority has treated the entities as HAMAS entities;

      d.    The Palestinian population considers the committees "to be HAMAS."

124.    Arab Bank continues to knowingly render financial services for many of these HAMAS fronts, terrorist operatives and their families, and others.   Arab Bank has also knowingly served as a conduit for transferring money from Iran and Syria and their agents and

instrumentalities to persons and organizations in Gaza and the West Bank who use such funds to engage in terrorism and incite violence.

**PIJ Alter Egos**

125.   The PIJ has also established numerous front organizations, including:

a.   Al-Ihsan Charitable Society, a/k/a Elehssan Society, a/k/a Elehssan Charitable Society; and

b.   Islamic An-Naqqa Society for Women, Bethlehem.

126.   Arab Bank provides financial services to Al-Ihsan Charitable Society with knowledge of or willful blindness to its role in supporting the PIJ.

127.   The HAMAS charitable front Al-Ansar Charity maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and drew the lines of liberty and the coming dawn.  The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

128.   The website further boasts that it has given money to Palestinians who were wounded, incarcerated or killed during the Second Intifada, including $6,000.00 to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7 children, and injured more than one hundred people at the Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

129.   The website of Al-Ansar shows the vital role of Arab Bank:

> The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

130.   Al-Ansar maintains an account with Arab Bank in Gaza.

131.   Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation for Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade.  Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, an agent of HAMAS.

132.   HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and the Islamic Charity Society of Hebron.

133.   The indictment specifies particular financial transactions initiated by HLF that resulted in monetary transfers to the Ramallah Charitable Committee.  Those transfers violate 18 U.S.C. §2339B.  HLF has been adjudicated liable for violating the Antiterrorism Act in the summary judgment order in the case of *Boim v. Quranic Literacy Institute, et al.*, 340 F. Supp. 2d 885 (N.D. Ill. 2004).

134.   Over 7 years ago, on May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ...."

135.   Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch and continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

136.   On January 10, 2001, a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997.  The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

137.   Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed Arab Bank on further notice of HLF's criminal activities.

138.   Similarly, the New York branch of Arab Bank has facilitated the transfer of significant sums to Tulkarem Charitable Committee, despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.

139.   Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS.

140.   One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous *Fatwa* -- or Islamic religious ruling – declaring that suicide bombings are permitted by Islamic law.  Mr. Badawi is a leading figure in HAMAS.

141.   Arab Bank has also knowingly laundered funds for INTERPAL, a London based "charity" that has raised funds in Europe for HAMAS for more than a decade.  Arab Bank, in turn, channeled tens of thousands of dollars for INTERPAL through its New York branch to various HAMAS zakat committees.  Arab Bank has also knowingly laundered money for the PIJ

and permitted PIJ to solicit donations to accounts maintained for the benefit of the PIJ at Arab Bank through the PIJ's website (www.Palestineway.com or www.abrarway.com). As Arab Bank recognized, those donations were utilized by the PIJ to fund its terrorist activities. Often, the account designated to receive these donations is maintained in the name of one of the "charitable" front organizations to try to mask the true purpose of the money. It is clear from the solicitations, however, that money is being sought for military uses and jihad and not humanitarian uses. Arab Bank knows of these solicitations or is willfully blind to them.

## Cultivation of the Culture of Death

142.    The "charitable" front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations. This fact is known to Defendant Arab Bank.

143.    As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

144.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, *"taking advantage of the conditions and the atmosphere of death."*

145.   Each of these front organizations officially holds itself out to the general public as a charitable organization with a purely humanitarian and benign purpose.  In fact, however, the primary mission of these organizations, as Defendant Arab Bank knows, is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations. Funds raised by the "charitable" front organizations are fungible and are allocated in part to terrorist activities.  Plaintiffs allege, as the Assistant Director of the FBI's Counterterrorism Division (Dale L. Watson) has stated, that crucial financial support for families of HAMAS suicide bombers is assisting HAMAS by providing a constant flow of suicide volunteers and buttressing the infrastructure of terrorist organizations.  Further, HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for their movement, including their illegal terrorist attacks against civilians.

146.   The front organizations make money available to HAMAS and the PIJ in accordance with the instruction of their leaders.  These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

147.   By knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS and the PIJ in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332, and has committed numerous overt acts in furtherance of the conspiracy. This wrongful conduct was approved and ratified by senior executives of the bank and by

management level employees of Arab Bank who were included on correspondence in which the Bank was instructed to send payments to the families of suicide bombers.

148.   Arab Bank knowingly maintained accounts for organizations affiliated with terrorist organizations, including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|---|---|---|---|
| Jenin | 581345 | Jenin Charitable Society | HAMAS |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | HAMAS |
| Nablus | 400336 | Nablus Islamic Aid Committee | HAMAS |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalgiliya | HAMAS |
| Tulkarem | 500010 | Tulkarem Charitable Society | HAMAS |
| Tulkarem | 503375 | Tulkarem Charitable Society | HAMAS |
| Nablus | 445444 | Al-Lod Charitable Society | HAMAS |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building Charitable Society | HAMAS |
| Qalgiliya | 540939 | Qalgiliya Charitable Society | HAMAS |
| Nablus | 400739 | Tubas Charitable Society | HAMAS |
| Ramallah | 666473 | Jama'ah al-Islamiya | HAMAS |
| Al-Manara-Qalgiliya | 610686 | Ramallah Charitable Society | HAMAS |
| Al-Bireh | 649611 | Al-Bireh Al-Islah Society | HAMAS |
| Bethlehem | 717520 | Bethlehem Elehssan Society | HAMAS |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |
| Hebron | 760376 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 750049 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 751100 | Hebron Young Muslims' Society | HAMAS |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | HAMAS |
| Hebron | 751542 | Hebron Elehssan Society | HAMAS |
| Bethlehem | 711161 | Al-Islah Charitable Society | HAMAS |
| Al-Bireh | 609509 | Al-Huda Society — Ramallah | HAMAS |
| Gaza | 124109 | Central Islamic Society — Gaza Strip | HAMAS |
| Ramal | 100208 | Charitable and Children's Mercy Society — Gaza Strip | HAMAS |

| Gaza | 10188 | House of the Qur'an and Sunnah Society | HAMAS |
|------|-------|------------------------------------------|-------|
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | HAMAS |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | HAMAS |
| Gaza | 365459 | The Al-Nur Prisoner Society | HAMAS |
| Khan Yunis | 2001438 | Khan Ynnis Charity and Mercy Society | HAMAS |
| Gaza | 5858 | Nusseirat Islamic Society | HAMAS |
| Gaza | 150/3 | Khan Yunis Charitable Society | HAMAS |
| Gaza | 35287 | Gaza Charitable Society for the Sick | HAMAS |
| Gaza | 3155 | The Islamic University — Gaza | HAMAS |
| Khan Yunis | 200139 | Qararab Islamic Society | HAMAS |
| Gaza | 15115 | Jabalia Islamic Society | HAMAS |
| Rafah | 2036 | Rafah Islamic Society | HAMAS |
| Azariya | 302656 | Azariya Society for the Fostering of Women | HAMAS |
| Gaza | 39435 | Nur Al-Ma'rifah Society | HAMAS |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Islamic Jihad |

149.    Arab Bank has also provided financial services to other terror organizations.  For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative, and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002 assault on the Hadera banquet hall.  Arab Bank is aware that it provides financial services to the AAMB and other PLO terrorist cells.

150.    On October 3, 2000, during the early days of the Intifada, Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former HAMAS leader who was killed on March 22, 2004, were interviewed on 'Ala al-Hawaa' ["On the air"], a program that appears on Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia).  The program showed a slide of the names of banks and account numbers where

donations could be deposited for the Palestinians participating in the violent confrontation with Israel, specifically: Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510.

151.    The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served HAMAS) posted an announcement on May 3, 2004 condemning the Israeli Air Force's attack on the station.  The announcement read as follows: "In order to help renew our broadcasts, you can donate to the Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

152.    A HAMAS-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through terrorist organizations around the world, including Interpal, Al-Aqsa Foundation, and CBSP.  The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon.  Furthermore, the 101 Days Campaign published a request on its official website that visitors to its website donate to the organization through its accounts in any branch of the Arab Bank.

153.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations.  HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority.  The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

154.    Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

155.    Arab Bank provides financial services to agents of HAMAS by maintaining bank accounts for the following designated Foreign Terrorist Organizations affiliated with HAMAS:

    (1)      The Association de Secours Palestinien (ASP) —Arab Bank, Zurich;

    (2)      Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) -- Arab Bank, Paris; and

    (3)      Palestinian Association in Austria -- Arab Bank, Paris.

156.    By knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated Foreign Terrorist Organizations, Arab Bank has substantially assisted HAMAS and other terrorist organizations in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism and has committed numerous overt acts in furtherance of the conspiracy.

157.    Indeed, had the doors of Arab Bank not been opened to HAMAS or the PIJ during the past four and a half years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely never have reached their destination.  By acting in the manner described herein, Arab Bank has facilitated the increase in terrorist attacks and incentivized the conduct of the suicide bombers.

158.    A bank that knowingly provides material support of this kind, directly or indirectly, to international terror organizations such as HAMAS, PIJ, AAMB or the others described in this Complaint is liable for all of the foreseeable acts committed by the terror organizations.  Arab Bank is therefore secondarily liable for the wrongful deaths and injuries of plaintiffs who were injured or killed by terror organizations that Arab Bank supported.

## CLAIMS FOR RELIEF

## COUNT ONE

### PROVIDING MATERIAL SUPPORT TO
### TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A

159.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

160.   The extraordinary financial and administrative services that Arab Bank has knowingly provided to terrorists, their families, HAMAS, the PIJ, AAMB and their alter egos, including serving as the exclusive administrator of universal coverage insurance to the families of suicide bombers and other terrorists, provided material support to the preparation and carrying out of numerous acts of international terrorism that have caused direct injury to Plaintiffs.

161.   By its violations of 18 U.S.C. § 2339A, defendant Arab Bank is liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

## COUNT TWO

### COMMITTING ACTS OF INTERNATIONAL
### TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1)

162.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

163.   Arab Bank has provided material support to Foreign Terrorist Organizations in violation of 18 U.S.C. §§ 2339B(a)(1).

164.   A bank that knowingly provides material support of this kind, directly or indirectly, to a foreign terror organization such as HAMAS, PIJ and AAMB is secondarily liable

for all of the foreseeable acts committed by the terror organizations.  Arab Bank is therefore liable for the injuries and deaths described herein.

165.    By committing violations of 18 U.S.C. § 2339B, Defendant Arab Bank is liable pursuant to 18 U.S.C. § 2333 for all damages that Plaintiffs have sustained as a result of such injuries.

### COUNT THREE

### FINANCING OF TERRORISM IN
### VIOLATION OF 18 U.S.C. § 2339C

166.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

167.    The financial services that Arab Bank has willfully and unlawfully provided to HAMAS, the PIJ, AAMB and the Saudi Committee include the collection of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians, such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.  The purpose, by its nature or context, was to intimidate a population or to compel the government of Israel to do or abstain from doing an act.

168.    Because it willfully violated 18 U.S.C. § 2339C, Arab Bank is liable pursuant to 18 U.S.C. § 2333 to Plaintiffs, who have suffered injuries to their business, person or property by reason of such acts.

## COUNT FOUR

### ARAB BANK COMMITTED ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. §§ 2339A, 2339B, AND 2339C

169.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

170.    Defendant Arab Bank's own acts of providing banking and other services, including the provision of death benefits, to HAMAS, the PIJ, the AAMB and other international terrorists, were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction."

171.    Accordingly, Arab Bank's own acts constitute acts of international terrorism as defined by 18 U.S.C. § 2331.

172.    Pursuant to 18 U.S.C. § 2333, Arab Bank is therefore civilly liable to Plaintiffs for the damages resulting to their person, property or business by reason of Arab Bank's acts of international terrorism.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)  Accept jurisdiction over this action;

b)  Enter judgment against Arab Bank and in favor of Plaintiffs for all compensatory and other damages in such amounts for each named Plaintiff as are allowed by applicable law and as shall be determined at trial;

c) Enter judgment against Arab Bank and in favor of Plaintiffs for treble damages of each amount awarded pursuant to the previous prayer for relief pursuant to 18 U.S.C. § 2333;

d) Enter judgment against Arab Bank and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e) Grant such other and further relief as the interests of justice may require, including leave to amend this complaint so as to permit justice to be served on behalf of Plaintiffs against the Defendant and any other parties as may hereafter be named in this action.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated: April 7, 2006
      New York, New York

**SHALOV STONE & BONNER LLP**

By: _____
     James P. Bonner (JB-0629)
485 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

Attorneys for Plaintiffs


Of Counsel:

**SAYLES WERBNER P.C.**
Mark S. Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive
Suite 260
Woodlands, Texas  77380
(281) 296-9090