**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**STEWART WEISS & SUSAN WEISS, et al.,**

                         **Plaintiffs,**　　　　　　　　**OPINION AND ORDER**

     -against-　　　　　　　　　　　　　　　　06 CV 1623 (NG) (VVP)

**ARAB BANK, PLC,**

                         **Defendant.**
-------------------------------------------------------------X

**GERSHON, United States District Judge:**

      Plaintiffs are the family members of five United States citizens who, while actively serving in the Israeli Defense Forces (the "IDF") in Israel, were victims of terrorist attacks. Defendant is a financial institution headquartered in Jordan. Plaintiffs bring several claims against defendant under the civil remedy provision of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331, *et seq.*, claiming that defendant provided material support to terrorists, committed acts of international terrorism, and financed international terrorism.[1] Defendant now seeks to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, defendant's motion is denied.

---

[1] The Anti-Terrorism Act of 1990 was repealed in its entirety in 1991; its substantive provisions were, however, reenacted in 1992. Although the substance of the provisions remained virtually unchanged, the newly-enacted public law did not designate a short title for the collection of provisions. For the sake of simplicity, however, I use the acronym "ATA" to refer to the terrorism-related provisions contained in §§ 2331- 2338 of chapter 113B of Title 18 of the U.S. Code. For a more detailed background of the ATA, *see Almog v. Arab Bank*, 471 F. Supp. 2d 257, 265-266 (E.D.N.Y. 2007).

# FACTS

The following facts are alleged in the Complaint and accepted as true for purposes of this motion:

This case concerns the murder of five United States citizens who were also citizens of the State of Israel: Ari Weiss, Shaul Lahav, Mantanya Robinson, Shmuel Weiss and Hagai Lev (the "Terror Victims"). The Terror Victims were allegedly killed by acts of international terrorism, as defined by 18 U.S.C. § 2331, while serving in the IDF. Three terrorist organizations, individually or in combination, are alleged to have carried out these acts: the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad (the "PIJ"), and the Al Aqsa Martyrs Brigade ("AAMB"). HAMAS was named a Specially Designated Terrorist entity ("SDT") by the U.S. government in 1995, designated a Foreign Terrorist Organization ("FTO") by the U.S. Secretary of State in 1997, and has been designated a Specially Designated Global Terrorist Entity ("SDGT"). The PIJ was designated an FTO by the U.S. Secretary of State in 1997. The AAMB was designated an FTO in 2002. In sum and substance, plaintiffs allege that, from at least the Fall of 2000 until at least late 2004, defendant knowingly and willfully conspired with and aided and abetted HAMAS, the PIJ, and AAMB. Specifically, plaintiffs allege that defendant knowingly provided material support and substantial assistance to those responsible for the terror attacks that killed the Terror Victims. The facts regarding each of these attacks are detailed below.

Ari Weiss ("Ari") was a citizen of the United States residing in Israel at the time he was assassinated by a Palestinian terrorist. Ari was born in Dallas, Texas in 1980. He lived there with his parents until 1992, when the family moved to Israel. On September 30, 2002, Ari was serving with the IDF in an engineering battalion in the town of Nablus in the West Bank. Nablus, at the

time, was the location of the main Palestinian terrorism infrastructure and was the headquarters of the terrorist organizations' leadership in the West Bank. HAMAS, the PIJ, AAMB and other terrorist groups had leaders and planners located in Nablus. Joint terror operations often were planned and conducted from Nablus, especially from the old part of the town, the Casbah, and from nearby Palestinian refugee camps. At approximately 6 p.m., on September 30, 2002, Palestinian terrorists opened fire near the Nablus Casbah, hitting Ari and another member of the engineering battalion. Ari suffered a bullet wound in his shoulder, and the bullet entered his lung. Ari died as a result of these wounds. The PIJ claimed responsibility for the terror attack.

Shaul Lahav ("Shaul") was a citizen of the United States and Israel who was living in Israel at the time he was murdered by a Palestinian attack. On November 18, 2003, Shaul, then 20 years old, was serving with the IDF at a checkpoint on a tunnel bypass road near Bethlehem. This road links Jerusalem and Efrat, two major cities with large Jewish populations. At that time, numerous terrorists were attempting to enter Jerusalem from the West Bank to commit suicide bombings and other terror attacks as part of the "Second Intifada."[2] Soldiers had been placed in areas along the roads to try to establish safety for the civilian population under attack from these terror groups. Shortly before 6 a.m., on November 18, 2003, Shaul was assassinated by a Palestinian terrorist who opened fire with an automatic rifle at the checkpoint. The terrorist approached the checkpoint with

---

[2] Plaintiffs allege that, in September of 2000, following the collapse of peace negotiations between the State of Israel and the Palestinian Authority, Palestinian terrorist groups launched a broad-based terror campaign against the State of Israel. This campaign quickly became known in Arab parlance as the Al Aqsa Intifada or Intifada Al Quds – the "Second Intifada" in western parlance. This Second Intifada was marked from the outset by numerous acts of extreme violence, including multiple murders of civilians by Palestinian terrorist groups. The objectives of the Second Intifada included intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli and U.S. governments by compelling Israel to withdraw from territory it presently controls.

an AK-47 hidden in a prayer rug. The AAMB claimed responsibility for the attack.

Matanya Robinson ("Matanya") was a dual citizen of the United States and Israel who was living in Israel at the time he was murdered by a Palestinian terrorist attack. On April 8, 2002, Matanya, then 21 years old, was serving in the IDF in the Jenin area of the West Bank. Jenin was then known as the "Capital of the Palestinian Suicide Terrorists" because of the large number of suicide bombers who originated from the area. Various terrorist organizations engaged in substantial activity in Jenin at that time, including HAMAS, the PIJ, and AAMB. Many of the members of those terrorist organizations were concentrated in the refugee camp located in Jenin. During this time, PIJ gun squads operated in homes in the refugee camp and frequently ambushed and assassinated Jewish soldiers. While Matanya was in the Jenin refugee camp, he was assassinated when terrorists opened fire on him. Shmuel Weiss, a medic trying to come to Matanya's aid, was also shot and killed. The perpetrators were Palestinian terrorists.

Shmuel Weiss ("Shmuel") is described as having been the son of Ayre Weiss, a United States citizen. On April 8, 2002, Shmuel, age 19, was serving in the IDF in the Jenin refugee camp. As described above, he was murdered, along with Matanya, by Palestinian terrorists.

Hagai Lev ("Hagai") is described as having been a citizen of the United States because his mother is a United States citizen. His father is not. Hagai, age 24, was assassinated by Palestinian terrorists on July 10, 2002, while he was serving in the IDF in the Rafah area in the southern part of the Gaza strip. At that time, terrorists had dug many tunnels near Rafah to assist them in smuggling arms and explosives into the area to use in the terror attacks of the Second Intifada. Around 7 a.m., on July 10, 2002, Hagai was patrolling the Rafah area when a sniper opened fire on him from one of the houses nearby. The bullet struck Hagai in the face, and he died shortly

4

thereafter.

Defendant now seeks to dismiss the Complaint, arguing that plaintiffs' injuries resulted from acts which, based on the factual allegations in the Complaint, occurred "in the course of armed conflict" between "military forces." Such claims, defendant maintains, are precluded as a matter of law by 18 U.S.C. § 2336(a), the ATA's "act of war" exclusion. Accordingly, defendant asks that the court dismiss this case for lack of subject matter jurisdiction or, alternatively, for failure to state a claim. In opposition, plaintiffs contend that the allegations in the Complaint do not implicate the "act of war" exclusion. Plaintiffs concede that the Terror Victims were killed "in the course of armed conflict," but argue that the terrorists that killed the Terror Victims were not members of a "military force." Relief under the ATA, plaintiffs conclude, is therefore available.

## DISCUSSION

**I.      Standard of Review**

Defendant brings this motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and, alternatively, for failure to state a claim pursuant to Rule 12(b)(6). As an initial matter, I decline defendant's invitation to analyze the motion under Rule 12(b)(1). Plaintiffs invoke 28 U.S.C. § 1331 as the basis for this court's jurisdiction because their claims arise under the ATA, one of the laws of the United States. Defendant argues that, because plaintiffs' claims are precluded by Section 2336(a) of the Act, there remains no basis for the Court to exercise jurisdiction over the action. Determination of whether plaintiffs' claims are precluded by Section 2336(a) of the Act, however, requires the court to evaluate the sufficiency of plaintiffs' allegations. Accordingly, I will treat defendant's motion as

5

one for failure to state a claim under Rule 12(b)(6).[3]

In considering a motion to dismiss made pursuant to Rule 12(b)(6), the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiffs. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).

---

[3] I note that, as a practical matter, my analysis of this motion would be no different under Rule 12(b)(1). Although, under that rule, the court would be permitted to consult materials outside the four corners of the Complaint, *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), neither party relies upon such materials when arguing the question currently before this court: whether the individuals who murdered the Terror Victims were part of a "military force of any origin." While defendant submitted extraneous materials with its moving papers, and invited the court to review those materials under Rule 12(b)(1), it did so only in support of its contention that the Terror Victims were killed in the course of an "*armed conflict*." *See* Def. Mem. at 6-11. As noted above, plaintiffs have since conceded this point. *See* Pl. Opp. Mem. at 15. Accordingly, even under a Rule 12(b)(1) analysis, review of the extraneous materials would be unnecessary.

## II.     The ATA's "Act of War" Exclusion

The ATA provides that any U.S. national who has been injured by an act of international terrorism may bring a civil action in a United States district court, as may his estate, survivors or heirs:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). Congress has, however, precluded claims for injury resulting from an act of war: "No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." 18 U.S.C. § 2336(a). In order to state a claim for civil damages under Section 2333(a), plaintiffs must allege that the decedents were injured "by reason of" acts of "international terrorism." Defendant does not challenge that plaintiffs have done so. Defendant does challenge, however, plaintiffs' express allegation, and legal conclusion, that the acts are not "acts of war." The issue before the court, therefore, is whether this legal conclusion is supported by plaintiffs' factual allegations.

The ATA defines "act of war" to mean

> any act occurring in the course of—
> (A)   declared war;
> (B)   armed conflict, whether or not war has been declared, between two or more nations; or
> (C)   armed conflict between military forces of any origin.

18 U.S.C. § 2331(4). Defendant acknowledges that subsections (A) and (B) are inapplicable to this motion and therefore only subsection (C) requires discussion. Def. Mem. at 5. That is, the sole issue before the court is whether plaintiffs' injuries occurred "in the course of armed conflict

7

between military forces of any origin." Plaintiffs further narrow the court's inquiry by conceding that the Terror Victims "were killed 'in the course of' an 'armed conflict.'" Pl. Opp. Mem. at 15. Also, plaintiffs acknowledge that the Terror Victims, who were killed while actively serving in the IDF, were part of a military force. This leaves open only the question of whether, under the allegations of the Complaint, the terrorists who killed the Terror Victims were members of a "military force of any origin." If so, plaintiffs' claims are precluded as a matter of law.

As alleged in the Complaint, the Terror Victims were murdered by members of HAMAS, the PIJ, and AAMB, all three of which are designated terrorist organizations. Limited authority exists on whether a designated terrorist organization can constitute a "military force" for purposes of 18 U.S.C. § 2331(4)(C). One court, however, has addressed this question and answered it in the negative. In *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006), a member of the United States Army and another soldier's executor brought ATA claims against a defendant who financed and abetted al Qaeda after the soldiers were attacked by al Qaeda terrorists while serving on active duty in Afghanistan. *Id*. at 1326-27. In the course of granting plaintiffs' motion for default judgment, after defendant had failed to respond to the complaint, the court analyzed the "act of war" exclusion *sua sponte*. *Id*. at 1330. The court concluded that "the acts complained of are not 'acts of war' under § 2336(a) but are acts of international terrorism under § 2331(1)." *Id*. at 1330-31. In reaching that conclusion, the court emphasized that al Qaeda could not be considered a "military force[ ] of any origin" under § 2331(4)(C):

> There are undoubtedly differences between military forces and terrorists. A conventional dictionary definition of "military" is "armed forces" or the persons serving in them. "Armed forces," in turn, are "the combined military, naval, and air forces *of a nation*." In contrast, "terrorism" is conventionally defined as "the systematic use of terror especially as a means of coercion." "Terror" itself is

8

> defined as "violent or destructive acts (as bombing) committed by *groups* in order to intimidate a population or government into granting their demands."
>
> As between these two possibilities, al Qaeda fits only in the latter, where plaintiffs have alleged they belong. Al Qaeda is not a "nation"; the people who fight in its behalf thus cannot be "armed forces" or the "military." It is, instead, a "group" that systematically uses violent and destructive acts in its attempts to coerce the United States into acceding to its demands.

*Id.* at 1334 (citations omitted).

The ATA's legislative history also suggests that a designated terrorist organization cannot constitute a "military force" for purposes of 18 U.S.C. § 2331(4)(C). Both the House and Senate Judiciary Committees' Reports concerning the ATA include section-by-section analyses of the statute. In discussing the "act of war" exclusion, the House and Senate Reports provide:

> This section excludes from the scope of any civil action a claim brought on account of "an act of war." The intention of this provision is to bar actions for injuries that result from military action by recognized governments *as opposed to terrorists*, even though governments also sometimes target civilian populations.

H.R. Rep. No. 102-1040 at 7 (1992); S. Rep. 102-342 at 46 (1992) (emphasis added). By distinguishing the acts of "recognized governments" from those of "terrorists," the reports suggest that Congress contemplated that the two are mutually exclusive.

In light of the ATA's language and legislative history, and as found by the *Morris* court, I find that a designated terrorist organization cannot constitute a "military force of any origin." Even though subsection (C) extends the "act of war" exclusion to armed conflicts between military forces that are not the military forces of recognized nations, there is no sound basis for viewing the subsection (C) exclusion as extending to terrorist organizations. To find otherwise would pervert the very purpose of the ATA, which was enacted to deter terrorist activity and hold liable those who

9

engage in it.  In sum, given the express allegations of the Complaint, that the Terror Victims were killed by individuals working for designated terrorist organizations, there is no basis for dismissal of the Complaint under the "act of war" exclusion.

Defendant's arguments to the contrary are unpersuasive.  First, defendant summarily argues that relief under the ATA is unavailable to soldiers who are injured during the course of an armed conflict:  "Because the injuries at issue here, as they are alleged, were incurred by soldiers, and thus plainly combatants, during the course of an armed conflict, any damages arising from such acts must logically be read to fall within the armed conflict exclusion of the Anti-Terrorism Act, 28 U.S.C. § 2336(a)."  Def. Mem. at 13.  This argument ignores one of the express requirements of 18 U.S.C. § 2331(4)(C):  that, to constitute an "act of war," the armed conflict in question must be "*between military forces* of any origin." *Id.* (emphasis added).  As detailed above, I find that the Terror Victims were not killed by a "military force."  Accordingly, that the Terror Victims were themselves part of a "military force," and that they were killed "during the course of an armed conflict," does not preclude plaintiffs from seeking relief under the ATA.  *See Morris*, 415 F. Supp. 2d at 1339 (upholding American soldiers' ATA claims for injuries they suffered while in active service abroad).

Second, defendant argues that U.S. citizens, who choose to serve in foreign armies, cannot obtain relief under the ATA:  "The Court may reasonably infer that even absent the express preclusion of Section 2336(a), a law enacted to redress injuries to U.S. citizens at home and while traveling abroad was never intended to redress injuries to those who choose to serve in foreign armies."  Def. Mem. at 6, n.2.  Defendant offers no support for this argument, which is contrary to the plain language of the ATA.  *See* 18 U.S.C. § 2333(a) (providing a claim for relief to "*[a]ny*

*national* of the United States injured in his or her person, property, or business by reason of an act of international terrorism") (emphasis added). I therefore reject it.

Finally, third, with regard to the controlling issue on this motion, defendant argues that HAMAS, the PIJ, and AAMB are, in fact, military forces. To that end, defendant cites several passages from the Complaint in which plaintiffs utilize the words "paramilitary" and "military" in describing the terrorist groups and their activities:

> Hamas . . . is divided into two separate wings, the political wing . . . and the *paramilitary* wing.
>
> Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of money collected externally under charitable and humanitarian banners are routed for HAMAS *military* and other operational uses . . . .
>
> AAMB is a *paramilitary* offshoot of the governing Fatah movement which emerged at the outset of the Second Intifada. Force 17 and Tenzim are also *paramilitary* offshoots of Fatah . . . .
>
> [With regard to the solicitation of monies that Arab Bank is alleged to have improperly aided and abetted,] [i]t is clear from the solicitations . . . that the money is being sought for *military* uses.

Compl. ¶¶ 38, 40, 47, 141. In essence, defendant argues that plaintiffs' own allegations establish that these groups are "military forces," within the meaning of the ATA. This argument mischaracterizes the allegations of the Complaint. To describe, in common parlance, as the Complaint does, that the terrorists engage in military or paramilitary-type activities does not mean that HAMAS, the PIJ, or AAMB is a "military force" within the meaning of the ATA's "act of war" exclusion. On the contrary, as explained above, there is no sound basis for concluding that the term "military force," as used in the ATA, encompasses designated terrorist groups.

**III.    Defendant's Additional Grounds for Dismissal**

In addition to arguing that plaintiffs' claims are precluded by the ATA's "act of war" exclusion, defendant argues that the Complaint should be dismissed for the same reasons it unsuccessfully advanced in previous, related cases. *See Almog v. Arab Bank*, 471 F. Supp. 2d at 257 (E.D.N.Y. 2007); *Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005). For the reasons set forth in those opinions, I find that plaintiffs have adequately pled the elements of their ATA claims.

**CONCLUSION**

For the reasons set forth above, defendant's motion to dismiss is denied.

SO ORDERED.

/s
**NINA GERSHON**
**United States District Judge**

Dated:  Brooklyn, New York
            December 21, 2007